UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Melissa Huestis,

     Plaintiff,

     v.                                         Civil Action No. 2:13-cv-201

Commissioner of Social Security,

     Defendant.

## <u>OPINION AND ORDER</u>
(Docs. 10, 13)

Plaintiff Melissa Huestis brings this action pursuant to 42 U.S.C. § 405(g) of the
Social Security Act, requesting review and remand of the decision of the Commissioner
of Social Security ("Commissioner") denying her application for disability insurance
benefits.  Pending before the Court are Huestis's motion to reverse the Commissioner's
decision (Doc. 10), and the Commissioner's motion to affirm the same (Doc. 13).  For the
reasons stated below, the Court DENIES Huestis's motion, and GRANTS the
Commissioner's motion.

## <u>Background</u>

Huestis was 27 years old on her amended alleged disability onset date of
February 2, 2010.  She has a high school education and work experience as a bakery
helper, conveyer feeder, sales clerk, route-delivery driver, counter attendant, cafeteria
attendant, and fountain server.  She is divorced and has three children.  As of March

2012, Huestis was living in an apartment with her boyfriend and working in the

Hannaford's bakery for between 11 and 35 hours each week.  (AR 35, 39.)

The record reflects that Huestis had a traumatic childhood, and has a long history

of mental problems.  She was verbally and physically abused by her mother as a child

and was also the victim of sexual abuse both as a child and an adult.  (AR 549, 567, 723,

873, 995.)  She has three sons who were ages ten, four, and three, respectively, as of the

March 2012 administrative hearing.  (AR 33.)  Huestis was married to the father of her

sons for ten years, but he was verbally and physically abusive toward her so she left him

in 2009 or 2010.  (AR 549, 567, 723, 873, 995.)  In or around July 2010, Huestis's sons

were removed from her custody by the Department for Children and Families ("DCF")

apparently under suspicion that they were being physically abused.  (AR 549–50, 723,

873.)  As of March 2012, the children were living with Huestis's ex-husband (AR 33),

and Huestis had not seen them for "roughly four months" (AR 34).

In October 2010, Huestis was admitted to Rutland Regional Medical Center for

psychiatric care after advising her family counselor about a suicide plan.  (AR 549–50,

562–63.)  Upon her discharge three days later, she was diagnosed with adjustment

disorder with depressed mood.  (AR 563.)  The hospital note describes her condition

upon admission as follows:

> [Huestis] was admitted . . . after presenting to the Emergency Department
> with her family counselor after becoming upset and depressed in the
> context of multiple psychosocial stressors and stating that she had a suicidal
> plan to drive her car into a truck.  [Huestis] reports multiple social stressors
> at the time . . . which included financial difficulties with difficulty paying
> her electric bill, difficulty with legal issues in having to perform 100 hours

2

> of community service due to a felony charge she had[1], and inability for her
> or her live-in boyfriend to find work exacerbating the financial problems.
> Her children are currently in DCF custody which is also a source of stress
> for her.

(AR 562.)  The hospital note also states that Huestis had stopped using her medications

several days prior to her admission, "which may have contributed to her increased

feelings of depression around the social stressors."  (*Id.*)  On the morning after her

admission, Huestis was noted to present as "bright and cheerful with good affect,"

denying symptoms of depression or suicidality.  (*Id.*)  Her electric bill had been paid; she

was planning to attend her son's birthday party; and she had scheduled appointments with

a psychiatric nurse practitioner and her primary care physician.  (AR 562–63.)

In or around October 2010, Huestis filed applications for social security income

and disability insurance benefits.  In her disability application, she alleged that, starting

on December 31, 2006, she has been unable to work due to "emotional and mental

issues."[2]  (AR 222.)  Huestis later testified that her most significant impairments were not

being able to be around many people and having blackout "spells" periodically.  (AR 41.)

She further testified that she was easily overwhelmed with the daily activities and

stressors of life.  (AR 43–44.)  Huestis's application was denied initially and upon

reconsideration, and she timely requested an administrative hearing.  The hearing was

held on March 20, 2012 by Administrative Law Judge ("ALJ") Paul Martin.  (AR 27–

72.)  Huestis appeared and testified, and was represented by an attorney, who amended

---

[1]  Huestis has a felony conviction for forgery and larceny.  (AR 549, 874, 995.)

[2]  Huestis's attorney confirmed at the March 2012 administrative hearing that Huestis was not
alleging any physical impairments.  (AR 57.)

the alleged disability onset date to February 2, 2010 at the start of the proceeding.  (AR 30.)  A vocational expert ("VE") also testified at the hearing.  On April 27, 2012, the ALJ issued a decision finding that Huestis was not disabled under the Social Security Act from December 31, 2006 through the date of the decision.  (AR 12–21.)  Thereafter, the Appeals Council denied Huestis's request for review, rendering the ALJ's decision the final decision of the Commissioner.  (AR 1–6.)  Having exhausted her administrative remedies, Huestis filed the Complaint in this action on July 18, 2013.  (Doc. 1.)

## **ALJ Decision**

The Commissioner uses a five-step sequential process to evaluate disability claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d).  The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity ("RFC"), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant

medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).  The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Martin first determined that Huestis had not engaged in substantial gainful activity since her alleged disability onset date of December 31, 2006.[3]  (AR 14.)  At step two, the ALJ found that Huestis had the severe impairments of anxiety disorder and depressive disorder.  (AR 15.)  At step three, the ALJ found that none of Huestis's impairments, alone or in combination, met or medically equaled a listed impairment.  (AR 15–16.)  Next, the ALJ determined that Huestis had the RFC to perform "a full range of work at all exertional levels," but with the following non-exertional limitations:

---

[3] Even though, as stated above, Huestis amended her alleged disability onset date to February 2, 2010 at the administrative hearing (*see* AR 30), the ALJ referred to the initial alleged disability onset date of December 31, 2006 throughout his decision (*see* AR 12, 14, 21).  Huestis does not raise the issue, and I find that the ALJ's error is harmless.

> [Huestis] is limited to simple, repetitive, and routine tasks, performed in a work environment free of fast-paced production requirements and involving only simple work[-]related decisions and routine workplace changes. [She] requires being isolat[ed] from the public other than very superficial contact. She has the ability to interact with coworkers and supervisors in a routine setting on an occasional basis. She can interact with no more than 7 or 8 people with whom she is familiar at one time.

(AR 16.)

Given this RFC, and considering the VE's testimony, the ALJ found that Huestis was unable to perform her past relevant work as a bakery helper, conveyer feeder, sales clerk, route-delivery driver, counter attendant, cafeteria attendant, and fountain server. (AR 19.) Finally, and again considering the VE's testimony, the ALJ determined that Huestis could perform other jobs existing in significant numbers in the national economy, including the following representative occupations: bakery line worker, cleaner, laundry worker, and folder. (AR 20.) The ALJ concluded that Huestis had not been under a disability from the initial alleged disability onset date of December 13, 2006 through the date of the decision. (AR 21.)

## **Standard of Review**

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy."  42 U.S.C. §

423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the

administrative record *de novo* to determine whether there is substantial evidence

supporting the . . . decision and whether the Commissioner applied the correct legal

standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*,

221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  The court's factual review of

the Commissioner's decision is thus limited to determining whether "substantial

evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v.

Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d

Cir. 1990) ("Where there is substantial evidence to support either position, the

determination is one to be made by the factfinder.").  "Substantial evidence" is more than

a mere scintilla; it means such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971);

*Poupore*, 566 F.3d at 305.  In its deliberations, the court should bear in mind that the

Social Security Act is "a remedial statute to be broadly construed and liberally applied."

*Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

<u>Analysis</u>

**I.      Difficulties in Concentration, Persistence, and Pace**

Huestis argues that the ALJ erred in failing to include Huestis's moderate

difficulties in concentration, persistence, or pace in his RFC determination and

hypothetical to the VE.  (Doc. 10-1 at 8.)  The Court finds no error.

At step three of the sequential analysis, the ALJ assessed whether Huestis's mental impairments satisfied the "paragraph B" criteria of § 12.00 of the Listings, and concluded they did not.  (AR 15–16.)  Specifically, the ALJ found that Huestis had only "mild restriction" in activities of daily living and "moderate difficulties" in social functioning and concentration, persistence, or pace.  (AR 15.)  Regarding Huestis's limitations in concentration, persistence, or pace, the ALJ explained that Huestis reported having limitations in memory and following oral instructions, and having black-out spells causing memory loss.  (*Id.*)  The ALJ pointed out, however, that Huestis was nonetheless "able to maintain employment at a job that require[d] her to follow written instructions even despite the alleged spells."  (AR 16.)  Having made these findings at step three, the ALJ did not explicitly include any limitations in concentration, persistence, or pace either in his RFC determination or in his hypothetical to the VE.  But as noted above, the ALJ did include other non-exertional limitations in the RFC determination and hypothetical, including for example being able to do only simple, repetitive, and routine work with only occasional interaction with others.  (AR 16, 57.)

The ALJ accurately stated at step three that "[t]he limitations identified in the 'paragraph B' criteria are not a[n] [RFC] assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process."  (AR 16.)  *See* SSR 96-8p, 1996 WL 374184, at *4 (July 2, 1996).  It follows that the ALJ is not required to explicitly include the "paragraph B" limitations in his RFC assessment or hypothetical to the VE.  *See id.* ("The mental RFC assessment used at steps 4 and 5 . . . requires a more detailed assessment [than that required under the 'paragraph B' criteria at

steps 2 and 3].”); *Yoho v. Comm’r Soc. Sec.*, 168 F.3d 484, 1998 WL 911719, at *3 (4th Cir. 1998) (Table) (“There is no obligation . . . to transfer the [‘paragraph B’] findings . . . verbatim to the hypothetical questions.”); *Burrows v. Barnhart*, Civil No. 3:03CV342 (CFD)(TPS), 2007 WL 708627, at *14 (D. Conn. Feb. 20, 2007) (ALJ’s “paragraph B” finding that plaintiff seldom had deficiencies in concentration, persistence, or pace “related to his analysis of the severity of his mental impairments under step 2, and thus he was not required to include this finding in his more detailed [RFC] assessment at step 5”).[4]  The Second Circuit very recently addressed this issue in *McIntyre v. Colvin*, Docket No. 13–2886, 2014 WL 3030378 (2d Cir. July 7, 2014), and directs a finding in the Commissioner’s favor.

In *McIntyre*, like here, the ALJ found at step three that the plaintiff had moderate difficulties in maintaining concentration, persistence, or pace, but did not explicitly include these non-exertional functional limitations in the RFC determination or the hypothetical to the VE.  *Id.* at *3.  In fact, the ALJ in *McIntyre* did not include *any* non-exertional functional limitations in the RFC determination, although, as here, the ALJ’s hypothetical to the VE limited the plaintiff to simple, routine, low-stress tasks.  *Id.* at *3-4.  The Second Circuit found that the ALJ’s hypothetical should have explicitly incorporated the claimant’s limitations in concentration, persistence, or pace.  *Id.* at *4. Nonetheless, the Court concluded that the ALJ’s error was harmless, holding as follows:

---

[4]  The Second Circuit has stated that an ALJ’s RFC assessment need only “afford[] an adequate basis for meaningful judicial review, appl[y] the proper legal standards, and [be] supported by substantial evidence such that additional analysis would be unnecessary or superfluous.”  *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013) (collecting cases).

> [A]n ALJ's failure to incorporate non-exertional limitations in a hypothetical (that is otherwise supported by evidence in the record) is harmless error if (1) "medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace," and the challenged hypothetical is limited "to include only unskilled work"; or (2) the hypothetical "otherwise implicitly account[ed] for a claimant's limitations in concentration, persistence, and pace[.]"

*Id.* (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011) (collecting cases)).  As discussed below, this test is met here.[5]  Therefore, even assuming the ALJ erred in failing to incorporate Huestis's limitations in concentration, persistence, or pace into his RFC determination and hypothetical to the VE, the error was harmless.

First, the ALJ's hypothetical to the VE implicitly accounted for Huestis's limitations in concentration, persistence, or pace, by limiting the hypothetical claimant to "simple, routine, and repetitive[-]type tasks, performed in a work environment that would be free of fast[-]paced production requirements involving only simple work[-]related decisions and routine work place [sic] changes."  (AR 57.)  The ALJ also limited the VE's testimony to unskilled jobs, asking: "[A]re there any unskilled occupations such a[ hypothetical] individual could perform?"  (AR 58.)  In response, the VE listed only "unskilled" jobs.  (AR 59–60.)

Second, medical evidence—including the opinions of two treating medical providers and two non-examining agency consultants, each of which was analyzed and

---

[5]  The test was met in *McIntyre* as well, the Court finding that "substantial evidence in the record demonstrates that McIntyre can engage in simple, routine, low stress tasks, notwithstanding . . . her limitations in concentration, persistence, and pace[,]" and that the ALJ sufficiently accounted for the combined effect of McIntyre's impairments by limiting the hypothetical to the VE to these types of tasks. *Id.* at *4 (internal quotation marks omitted).

relied on in the ALJ's decision (*see* AR 18–19)—demonstrates that Huestis was able to engage in simple, routine tasks or unskilled work during the alleged disability period, despite her limitations in concentration, persistence, or pace.  The agency consultants, psychologists Dr. Ellen Atkins and Dr. Joseph Patalano, each opined that, although Huestis had limitations in concentration and persistence preventing her from being able to perform high-stress tasks, she could nonetheless sustain concentration, persistence, and pace for two-hour periods over an eight-hour workday.  (AR 68, 71, 81, 95, 98.)  Drs. Atkins and Patalano further opined that Huestis retained the understanding and memory for three+-step simple instructions, was capable of routine collaborating with supervisors and limited interaction with coworkers, and could manage routine changes in a low-stress work environment.  (AR 68, 81.)  The ALJ afforded "significant weight" to these opinions (AR 19), and they are consistent with the ALJ's RFC determination and hypothetical to the VE.  (AR 16, 57.)

The opinions of two treating medical providers, licensed masters-level psychologist Kimberly Rider[6] and advanced registered nurse practitioner Judi Ellwood, also support the ALJ's RFC determination and hypothetical to the VE.  Rider began treating Huestis in July 2010, and wrote a letter in December 2010 stating that Huestis was capable of virtually all work-related physical activities and "has evidenced the ability

---

[6]  The treating physician rule applies to Rider's opinions, given that the regulations define "acceptable medical sources" to include "[l]icensed or certified psychologists," 20 C.F.R. § 404.1513(a)(2), and the Social Security Administration's Program Operations Manual System ("POMS") provides that an individual is considered an "acceptable medical source" if the source shows as all or part of his or her title: "Licensed Psychologist-Masters" or "M.S., Psychologist," which Rider does (*see, e.g.*, AR 775, 796, 1584, 1585).  POMS DI 22505.004(A)(2), available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0422505004 (last visited July 10, 2014).

to understand, sustain attention[,] and . . . concentrate, interact socially[,] and adapt to her environment while she is working on her treatment issues." (AR 775.) Also in December 2010, Meghan Matta, Huestis's family support specialist, wrote a letter agreeing that Huestis was able to do virtually all work-related physical activities and stating as follows regarding Huestis's mental abilities:

> [Huestis] has been able to keep a schedule of meetings and displays understanding of what is being asked of her. Under high[-]stress situations[,] [she] struggles to stay focused and often feels overwhelmed. High stress causes her to feel helpless and overly emotional. She has a tendency to have memory loss during these times. [She] has shown that she can be persistent and often finds ways of solving her problems. [She] struggles with change and has a difficult time not knowing what her future holds. Sudden change is overwhelming for her, but once she is able to calm down and process the situation she often finds a solution.

> [Huestis] has good interpersonal skills. She is well spoken and written [sic] and shows compassion for others. She has been able to form relationships and make friendships.

(AR 265.) A December 2010 note from clinical nurse specialist Deborah Bethel is consistent with Rider's and Matta's letters from the same period. (AR 781.) The note documents Bethel's telephone conversation with Rider regarding the "abrupt difference in [Huestis's] presentation" during a treatment session between Huestis and Bethel, and states: "[Rider] recalls a change in [Huestis's] behavior after [her October 2011] hospitalization, when she reported being told that if she were mentally ill she could receive social security disability." (*Id.*) A few months later, in March 2011, Rider wrote another letter, this time stating as follows:

> [Huestis's] mental capacity for understanding and memory, sustained concentration[,] and persistence, social interaction, and adaptation are within normal limits. Although she professes phobias in social situations[,]

12

she has not provided any evidence of acting on these reported feelings.  Her
abrupt departure/crisis' [sic] from social situations, to my knowledge, have
been precipitated by other people confronting her about her financial
responsibilities and she has been successful in having other
agencies/people/churches providing for her financial need at these times of
crisis.

(AR 796.)

In January 2012, nurse practitioner Ellwood completed a Medical Source

Statement of Ability to Do Work-Related Activities (Mental) wherein she opined that

Huestis's ability to understand, remember, and carry out instructions was not affected by

any mental impairment.  (AR 985.)  Ellwood stated: "at [Huestis's] job[,] the tasks are on

a list [her employer] gives her [and] she follow[s] directions[;] she [also] uses

complicated recipes."  (*Id.*)  Ellwood further stated that Huestis's mental impairments

only mildly affected her ability to respond appropriately to usual work situations and

changes in a routine work setting and moderately affected her ability to interact

appropriately with the public.  (AR 986.)  Ellwood concluded that Huestis's impairments

would "never" cause her to be absent from work, "as long as she is not asked to be

around a lot of people."  (AR 987.)

Not only are the opinions of psychologist Rider and nurse practitioner Ellwood

supported by and consistent with each other as well as with the opinions of family

support specialist Matta, clinical nurse specialist Bethel, and agency consultants Drs.

Atkins and Patalano; they are also consistent with the December 2010 Job Screening

Questionnaire of Janice Clark, Huestis's manager at Ray's Seafood Market, where

Huestis worked just before the amended alleged disability onset date.[7]  Clark stated that Huestis had worked full time as a clerk at Ray's Seafood from July 25 through November 8, 2009, when she "voluntarily quit."  (AR 244.)  Clark reported that Huestis generally could do all job functions—including for example, learning job duties in an expected amount of time, adapting to work changes, understanding and carrying out simple directions in a reasonable amount of time, and maintaining acceptable attendance—without problems.  (AR 244–45.)  Clark added: "[Huestis] was a good worker.  We were sorry to see her leave.  She was dependable and could work retail and wholesale kitchen[,] etc."  (AR 245.)

Also noteworthy, Huestis was able to work at a Hannaford's Supermarket during the alleged disability period.  She testified at the administrative hearing that she was working in the bakery department at a Hannaford's store, generally from 2:30 until 8:00 p.m., four or five days a week, although her hours fluctuated and she could work anywhere between 11 and 35 hours in a week.[8]  (AR 39.)  She stated that she would sometimes need to leave the job for up to 45 minutes "to calm down" (AR 41), but she was "fine" interacting with people in that job, as long as it was only "a couple here and there and not a constant" (AR 51).  In February 2012, her manager at Hannaford's, Rich Elnicki, provided a letter stating as follows: "We, at Hannaford['s] . . . , understand that

---

[7]  Supportability and consistency are proper factors for an ALJ to consider in assessing the opinions of treating physicians and other medical sources.  *See* 20 C.F.R. § 404.1527(c)(3)–(4); SSR 06-03p, 2006 WL 2329939.

[8]  In response to a question at the administrative hearing asking if Hannaford's had ever offered her more hours than she could handle, Huestis testified: "The current hours are what is offered right now[.]"  (AR 41.)

[Huestis] may need to step away from her job from time to time, due to her mental condition.  We adjust accordingly as needed, to allow her to do her job to the best of her abilities."  (AR 297.)  Despite Hannaford's apparent willingness to "adjust" to Huestis's need to take periodic breaks,[9] the fact that Huestis was able to perform this job during the alleged disability period, as well as the job at Ray's Seafood just prior to the alleged disability period, demonstrates that she could at least do some work.  *See* 20 C.F.R. § 404.1571 ("Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did."); *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) ("[T]he fact that [the claimant] could perform some work cuts against his claim that he was totally disabled.").  The ALJ properly considered this work activity, stating:

> [Huestis] has been able to work consistently for some time now.  While her earnings are just under what is required for substantial gainful activity, she testified that she would be able to work more hours if more were available.  [Her] ability to work at a job where she has to interact with customers and follow bakery instructions is very strong evidence that she would be able to work at a fairly isolated and simple job on a full-time and sustained basis.

(AR 18.)

Huestis claims a recent district court case, *Karabinas v. Colvin*, No. 6:12–CV–6578(MAT), 2014 WL 1600455 (W.D.N.Y. Apr. 21, 2014), supports her position that the ALJ was required to include his finding that Huestis had moderate limitations in concentration, persistence, or pace in his RFC determination.  (*See* Doc. 14 at 5–6.)  But

---

[9] Elnicki's statement regarding Huestis's possible need to take unscheduled breaks is discussed in more detail below.

*Karabinas* is easily distinguishable.  There, although the ALJ noted that the claimant had "moderate difficulties in maintaining concentration, persistence[,] or pace," he found that there was "insufficient evidence to support a finding that the claimant has any severe mental impairment" and thus did not incorporate any of these "moderate difficulties" into his RFC assessment or hypothetical to the VE.  *Id.* at *8.  In contrast, here, the ALJ found that Huestis's mental impairments were severe and thus considered them at each step of the sequential analysis.  (AR 15.)  Moreover, the ALJ in *Karabinas* did not limit the claimant to simple, routine, or unskilled work, and gave no consideration to the mental limitations he identified at step 3 when making his RFC determination.  *Karabinas*, 2014 WL 1600455, at *8.  Here, on the other hand, the ALJ's RFC determination limits Huestis to "simple, repetitive, and routine tasks, performed in a work environment free of fast-paced production requirements and involving only simple work[-]related decisions and routine workplace changes."  (AR 16.)

 *Hudson v. Commissioner of Social Security*, Civil Action No. 5:10–CV–300, 2011 WL 5983342 (D. Vt. Nov. 2, 2011), another case cited by Huestis (*see* Doc. 10-1 at 9), also does not require a finding in Huestis's favor.  In *Hudson*, this Court stated:

> [T]he ALJ . . . should have either explicitly included a "concentration, persistence, or pace" limitation in her hypothetical to the VE, or otherwise accounted for her own determination that Hudson had "moderate difficulties" in "concentration, persistence[,] or pace."  For example, the ALJ could have stated in her decision that medical evidence supports a finding that Hudson could perform basic work activities in spite of her moderate limitation in concentration, persistence, or pace.

*Hudson*, 2011 WL 5983342, at *10 (citation omitted).  Here, the ALJ impliedly stated in his decision that medical evidence supports a finding that Huestis could perform basic

work activities in spite of her moderate limitations in concentration, persistence, or pace.

As discussed above, the ALJ gave substantial weight to the opinions of Drs. Atkins and

Patalano, who explicitly stated that Huestis had moderate limitations in maintaining

concentration, persistence, or pace (AR 68, 95), but nonetheless opined that Huestis could

sustain concentration, persistence, and pace for two-hour periods over an eight-hour

workday (AR 68, 81).  Additionally, the ALJ gave substantial weight to the opinion of

psychologist Rider, who specifically stated that Huestis "has evidenced the ability to

understand, sustain attention[,] and . . . concentrate" (AR 775), and that Huestis's "mental

capacity for understanding and memory, sustained concentration[,] and persistence . . .

are within normal limits" (AR 796).

Accordingly, any error the ALJ made in failing to include specific limitations for

concentration, persistence, or pace in his RFC determination and hypothetical to the VE

was harmless.  Moreover, after reviewing the record, the Court finds that the ALJ's RFC

determination and hypothetical to the VE accurately portray Huestis's mental

impairments, and an ALJ may rely on the testimony of a VE in response to a hypothetical

question if the VE's testimony "addresses whether the particular claimant, with his

limitations and capabilities, can realistically perform a particular job."  *Aubeuf v.*

*Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981).

## II.     Periods of Cognitive Inefficiency

Huestis also argues that the ALJ erred in failing to consider or make findings

regarding Huestis's absences from her work station or periods of cognitive inefficiency

due to mental health problems.  (Doc. 10-1 at 7–8.)  Preliminarily, as discussed above,

17

the Court finds that the ALJ's assessment of Huestis's mental RFC is legally proper and supported by substantial evidence.

Huestis points out that the agency consultants each opined that Huestis "[m]ay have occasional prob[lem]s with [concentration/persistence] due to occasional increases in anxiety/depression associated with health and environmental stressors which temporarily undermine cognitive efficiency." (AR 71, 98.) But despite these "occasional problems," as discussed above, the consultants concluded that Huestis could sustain concentration, persistence, and pace for two-hour periods over an eight-hour workday. (AR 68, 81.) Moreover, this portion of the consultants' opinions is uncertain, stating merely that Huestis "*may*" have these occasional problems, not that she did or would. (AR 71, 98 (emphasis added).) This uncertainty is explained by Dr. Atkins's notation in her report that Huestis's treating psychologist (Rider) advised Huestis's treating nurse (Bethel) that Huestis "had noted [abrupt] behavior [change] after [Huestis's] hospitalization, when she was told she could receive disability if she were mentally ill," and by Dr. Atkins's statement in her report that she gave "significant weight" to Rider's opinion that Huestis "professes but does not show specific signs of social phobia, and mental capacities remain intact." (AR 95.) Even more telling, Dr. Atkins noted in her report that psychologist Rider "allud[ed] to [Huestis's] possible malingering." (*Id.*) Both Dr. Atkins and Dr. Patalano found Huestis's subjective symptomatic complaints to be only "[p]artially [c]redible" because the severity of her symptoms was "variable and not consistently at [the] levels alleged." (AR 70, 97.) In fact, as the Commissioner points out (Doc. 13-1 at 18), all three of the psychological experts whose opinions the ALJ

relied on to assess Huestis's mental limitations, including Huestis's own treating

psychologist (Rider), questioned Huestis's credibility regarding the extent of her mental

impairments.  The ALJ also questioned Huestis's credibility, finding that "[Huestis's]

statements concerning the intensity, persistence[,] and limiting effects of [her alleged]

symptoms are not credible to the extent they are inconsistent with the [ALJ's RFC]

assessment."  (AR 17–18.)  Huestis does not challenge the ALJ's credibility

determination, which is supported by substantial evidence.  (*See, e.g.*, AR 244–45, 265,

775, 781, 796, 985–87.)

Huestis claims the statement of Rich Elnicki, her manager at Hannaford's, that she

"may need to step away from her job from time to time, due to her mental condition" (AR

297), demonstrates that she was required to take unscheduled breaks, making her unable

to work.  (*See* Doc. 10-1 at 8.)  The Court rejects this claim, given that Elnicki merely

stated that Huestis "*may* need to step away from her job *from time to time*" (AR 297

(emphases added)), and it is unclear from the statement how regularly this occurred, if at

all, and for how long Huestis "step[ped] away" on each break.  Although the ALJ did not

explicitly consider Elnicki's note in his decision, the Court finds the oversight harmless

because it is clear the note has little value, and "[i]t would serve no purpose to remand

this case . . . for a statement of the obvious."  *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th

Cir. 2011); *see Petrie v. Astrue*, 412 F. App'x 401, 407 (2d Cir. 2011) ("[W]here the

evidence of record permits us to glean the rationale of an ALJ's decision, we do not

require that he have mentioned every item of testimony presented to him or have

explained why he considered particular evidence unpersuasive or insufficient to lead him

19

to a conclusion of disability.  Similarly, where application of the correct legal standard could lead to only one conclusion, we need not remand.") (citations and internal quotation marks omitted).

Huestis further claims that her mental health issues resulted in significant limitations impacting her vocational base because the VE testified that unscheduled breaks would impact that base.  (*See* Doc. 10-1 at 7-8.)  Although the VE did vaguely testify that "any employee setting where a person requires unscheduled breaks would impact a person's vocational base and . . . typically results in the need for some type of accommodation," he testified much more specifically as well, stating that if an individual needed to "walk away from [her] job for two to three unscheduled breaks[ for] at the most 45 minutes [and] at the least 15 minutes," as Huestis testified she was required to do, her ability to perform the jobs the VE had previously identified would be affected. (AR 61.)  The evidence does not demonstrate, however, that Huestis's mental impairments required her to take two or three unscheduled 15–45-minute breaks each day.

Huestis asserts that her cognitive impairments are demonstrated by a panic attack she experienced at a psychiatric evaluation in December 2011.  (Doc. 10-1 at 7 (citing AR 873).)  However, this incident does not require the ALJ to have included a limitation for cognitive periods of inefficiency in his RFC determination, especially given that Huestis told medical providers she had experienced symptoms of the panic attack only

after going over one week without her psychiatric medication[10] and after stopping treatment with psychologist Rider "because [Huestis] believe[d] [Rider] wrote a letter to disability stating she wasn't in need of services."  (AR 873.)  Moreover, the possible panic attack[11], did not occur at work or in response to any workplace triggers, so it provides neither support for Huestis's claimed need to take periodic unscheduled breaks during the workday nor information about the frequency or duration of these breaks. Also noteworthy, the ALJ considered treatment notes documenting Huestis's October 19, 2010 admission to Rutland Regional Medical Center's Emergency Department due to suicidal ideation, but properly afforded little weight to them because, as with the December 2011 treatment note documenting a possible panic attack, "the records indicate that [Huestis] had stopped taking her prescribed medication several days prior to admission."  (AR 18 (citing AR 797).)  As noted above, Huestis was discharged from the hospital on October 21, 2010, and the Discharge Summary states that Huestis had stopped taking her prescribed psychiatric medications "several days prior to her presenting to the Emergency Department[,] which may have contributed to her increased feelings of depression around [various] social stressors."  (AR 562.)  For the same reasons stated above regarding the note written by Huestis's manager at Hannaford's, the Court rejects Huestis's claim that the ALJ was required to explicitly consider the

---

[10]  The ALJ accurately stated in his decision: "[I]t appears that [Huestis] was relatively stable on prescribed medication.  Her testimony supports this finding, as she stated that her medications allow her to function without feeling too overwhelmed."  (AR 18; *see* AR 43 (anxiety medications help her not feel overwhelmed so she can still function), 50 (her depression "has actually gone down" due to medications, helping to "keep [her] kind of in sync"); *see also* AR 799, 804, 807.)

[11]  The treating provider stated merely that Huestis's presentation "*may* ha[ve] been a panic attack."  (AR 873 (emphasis added).)

December 2011 treatment note.  *See Petrie*, 412 F. App'x at 407 ("[W]e do not require

that [the ALJ] . . . have explained why he considered particular evidence unpersuasive or

insufficient to lead him to a conclusion of disability[, and] where application of the

correct legal standard could lead to only one conclusion, we need not remand.") (citations

and internal quotation marks omitted).

The Court also rejects Huestis's charge that the Commissioner improperly

engaged in *post hoc* rationalization of the ALJ's decision by "present[ing] her own

analysis and conclusions of the record evidence," particularly with respect to the

consulting psychologist opinions.  (Doc. 14 at 1.)  Although Huestis is correct that a

reviewing court generally may not accept the Commissioner's *post hoc* rationalizations

for agency action, *see Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999), the court can

nonetheless assess whether the ALJ's failure to consider certain evidence was harmless

error.  *See Berryhill v. Shalala*, 4 F.3d 993, 1993 WL 361792, at *7 (6th Cir. 1993)

(Table).  Moreover, the rule against *post hoc* rationalization for agency action "does not

mechanically compel reversal when a mistake of the administrative body is one that

clearly had no bearing on the procedure used or the substance of decision reached."

*Kurzon v. United States Postal Serv.*, 539 F.2d 788, 796 (1st Cir. 1976) (internal

quotation marks omitted).

**III.    Number of Jobs Huestis Could Perform**

Finally, Huestis claims in her motion that the Commissioner failed to satisfy her

burden at step five by providing numbers of jobs that were found in a "cluster" rather

than giving the exact number of jobs for each specific job identified.  (Doc. 10-1 at 10.)

22

Huestis has withdrawn this argument in her reply (*see* Doc. 14 at 6), and thus the Court does not consider it.

## **Conclusion**

For these reasons, the Court DENIES Huestis's motion (Doc. 10), GRANTS the Commissioner's motion (Doc. 13), and AFFIRMS the decision of the Commissioner.

Dated at Burlington, in the District of Vermont, this 25th day of August, 2014.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge